**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

               **Plaintiff,**

     **v.**                          **12-CR-261A**

**DONALD M. RUPPERT, JR.,**

               **Defendant.**
_____

## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

The defendant, Donald M. Ruppert, Jr. ("the defendant"), is charged in an indictment with having violated Title 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (Count 1) and Title 21 U.S.C. § 856(a)(1) (Count 2) along with a "Forfeiture Allegation" pursuant to Title 21 U.S.C. §§ 853(a)(1) and (2) and Title 21 U.S.C. § 853(p). Dkt #1. He has filed a motion seeking suppression of statements made by him which his attorney alleges "were the product of custodial interrogation and not spontaneous" and "were involuntarily made in that the statements were coerced and defendant was not properly advised of his Miranda rights pursuant to the United States Constitution, Amendments IV, V, VI and XIV." Dkt. #6, p. 12, ¶ 34. The defendant also seeks "suppression of

physical evidence" claiming that "the police conducted a warrantless search of [his]

home at 3757 Baker Street Extension, Busti, New York" and that such "search was

presumptively unreasonable, and done in violation of the 4th Amendment." Dkt. #6, p.

13, ¶s 39, 44.

An evidentiary hearing on the defendant's motion to suppress evidence

was held by this Court on February 13, 2013 at which time the government called

John R. Bentley, Chief of Police and Police Officer Paul A. Gustafson of the Lakewood-

Busti Police Department as witnesses in opposition to the defendant's motion to

suppress evidence. The defendant did not call any witnesses and he did not testify in

his own behalf. A transcript of the evidentiary hearing was filed on March 21, 2013.

Dkt. #9. The defendant and the government filed post-hearing memoranda on May 10,

2013. Dkt. #s 13 and 12 respectively. The matter was then taken under advisement by

this Court.

## **FACTS**[1]

Police Chief Bentley testified that while on duty on January 5, 2011 in the

Town of Busti at approximately 12:30 p.m., he "observed a van coming towards [him]"

in an eastbound direction on the Baker Street Extension which "appeared to be going at

---

[1] The facts are taken from the transcript of the evidentiary hearing and
references to the transcript herein are designated at "T" followed by the appropriate
page number(s). References to exhibits are to those received in evidence during the
evidentiary hearing.

a very high rate of speed in particular considering the weather conditions." T. 5-6. After activating the radar device in his police vehicle, Chief Bentley determined that the van "was going 86 miles an hour" in a 55 miles per hour speed zone. As a result, he "activated [his] emergency warning lights and [he] turned the siren on" and pursued the van until it came to a stop after "approximately half a mile." T. 6-7.

After obtaining the van operator's driving license, Chief Bentley determined that the van was being driven by the defendant. The defendant told Chief Bentley that "[he] was going so fast because [his] mother [had] fallen" and "she called [him] and said that she had fallen down." T. 7. The defendant further stated that "he had tried to call her back and she had not answered the phone." T. 7. Chief Bentley described the defendant as being "very visibly upset, agitated, [and] it appeared [that] he had ben crying." T. 7-8.

Chief Bentley testified that he "asked [the defendant] if he wanted me to assist him, and he stated that he did" and the Chief "told him that [he] would follow him to his house" and "[they] would check on [the defendant's] mother." T. 8. Chief Bentley "notified Dispatch of what [he] was about to do" and advised that they "may need emergency medical assistance at the residence." T. 9. He also "requested another car." T. 9. Sgt. Gustafson responded and "stated that he would come to back [the Chief] up." T. 9.

Thereafter, the defendant and Chief Bentley drove to the defendant's residence and arrived there simultaneously.  While the defendant was unlocking the front door to his residence, he thanked Chief Bentley "for coming with [him]" and the two of them entered the residence.  T. 10.  As they did so, the defendant's "mother appeared in the kitchen doorway" and the defendant asked her why she did not answer the phone.  She stated that she was all right.  T. 10.

At this point in time, Chief Bentley "smelled a very strong smell of what [he] felt was marijuana."  T. 10-11.

Chief Bentley asked the defendant "if he had been smoking marijuana" and the defendant stated, "no, not right then."  Nevertheless, Chief Bentley "could smell marijuana" and observed "blowers and fans going in the house."  T. 11.  When Chief Bentley asked the defendant "why the blowers were going," the defendant "stepped to the basement doorway and started to move a blower out of the way."  The Chief asked "what's going on" and the defendant replied, "well basically you know."  T. 11.  It was at this point in time that Sgt. Gustafson entered the residence.  T. 11,44.

The basement door "was slightly open" and "the blower was blowing air down the stairs."  There also "was a loud sound of numerous fans and/or blowers going on in the house."  T. 12.  The defendant began walking down the basement stairs, and Chief Bentley followed him and it became "very obvious there was marijuana growing in the house."  T. 12.  Since Sgt. Gustafson had just entered the residence and did not

know where the defendant's mother was, he followed Chief Bentley and the defendant down the basement stairs.  T. 44, 62.  In doing so, Sgt. Gustafson "observed what appeared to be an indoor grow operation of marijuana."  T. 44, 61.  Chief Bentley ordered the defendant to "stop" and directed Sgt. Gustafson to "take [the defendant] into custody."  T. 12-13, 45.

Sgt. Gustafson escorted the defendant out of the residence, and while standing "directly to the side of the road at the driveway where [their patrol] cars were positioned, he advised the defendant of his rights by reading *Miranda* warnings from a "*Miranda* card" which he carried.  The defendant acknowledged that he understood his rights and Sgt. Gustafson wrote the defendant's answers of "yes" to questions five (5) and six (6) on the *Miranda* warning card" and initialed the card along with the date and time of "1-5-10" (sic)[2] and "1:15 pm."  The defendant then signed the *Miranda* warning card."  Government Exhibit 1.[3]  T. 45-47, 49.  Question number 5 reads "Do you understand each of these rights I have explained to you?",  and question number 6 reads "Now that I have advised you of your rights are you willing to answer my questions?".  The defendant was then taken to the police department office.

---

[2] Sgt. Gustafson testified that the 1-5-10 date was in error in that "it was just after the first of the year" and he "was still in the 2010 mode."  The correct date was 2011. T. 66.

[3] Although none of the exhibits were separately marked at the evidentiary hearing since they were contained in a single packet with a Grand Jury Exhibit sticker "4," I have taken the liberty of marking them separately as government exhibits for purposes of this decision.

Upon arrival at the Lakewood-Busti Police Department office, Sgt Gustafson asked the defendant if he would sign a "Permission to Search" form authorizing the search of his residence and vehicles. The defendant agreed to sign such a form and did so. Government Exhibit 2. However, notwithstanding the written consent to search executed by the defendant, Chief Bentley decided that "there was plenty of time to get a search warrant" and therefore, no formal search of the defendant's residence was conducted" until the warrant was issued." T. 13-14.

Sgt. Gustafson continued the interview of the defendant at the police office and "reminded [the defendant] of his *Miranda* rights . . . by showing him the *Miranda* card that [they] had filled out together at the side of the road on Baker Street." The defendant once again acknowledged that he understood his rights and that he was willing to provide the police with a statement. T. 49. The defendant did give a statement to Sgt. Gustafson which was reduced to writing and signed by the defendant and Sgt. Gustafson as a witness. Government Exhibit 3. T. 50-51. In the statement, the defendant admits that "for the past 4 years [he has] been growing marijuana at [his] residence" and that he "had developed a growing operation, mainly in the basement of [his] house" and that "right now at [his] house [he has] approximately 200 marijuana plants growing in different stages along with "growing lights, bottles of $CO_2$, fans, blowers and electric running the rooms" consisting of "5 growing rooms, plus the garages." Government Exhibit 3.

After the signed statement of the defendant was obtained (Government Exhibit 3), Chief Bentley executed a "search warrant application" for a search warrant of the defendant's residence, two garages and a number of vehicles on the property. Government Exhibit 4. The observations of Chief Bentley when he first entered the defendant's residence combined with the signed statement of the defendant (Government Exhibit 3) formed the basis for establishing probable cause for the issuance of the search warrant. *See* Government Exhibit 4. Chief Bentley personally appeared before the Town Justice of the Town of Busti and presented the "Search Warrant Application" to him, and the Town Justice issued a search warrant authorizing the search of defendant's residence" and attached garage as well as two detached garages, a gray semi tractor trailer, a red storage trailer and numerous vehicles and the seizure of marijuana and evidence relating thereto. *See* Government Exhibit 5. T. 13, 29. A formal search of the defendant's residence and garages and vehicles was conducted pursuant to the search warrant and marijuana and growing materials and paraphernalia were seized from the defendant's premises. T. 15-16.

Sgt. Gustafson interviewed the defendant a second time after the search of his premises pursuant to the search warrant, and the defendant gave a second statement which was reduced to writing and signed by him on January 5, 2011. *See* Government Exhibit 4.

## <u>DISCUSSION AND ANALYSIS</u>

In support of his motion to suppress the use of evidence obtained on January 5, 2011, the defendant asserts that there are four issues which must be considered by the Court, to wit, (1) "the initial stop of the defendant's vehicle on the roadway;" (2) "the subsequent custodial detention of the defendant on less than reasonable suspicion;" (3) "the entry into the defendant's home;" and (4) "the subsequent search of the basement of the home by police." Dkt. #13, p. 2. Each of these issues will be separately addressed herein. In doing so, I find the testimony of Chief Bentley and Sgt. Gustafson given at the evidentiary hearing on February 13, 2013 to be totally credible.

### (1)    The Initial Stop Of Defendant's Vehicle

Chief Bentley testified that on January 5, 2011, he observed defendant's vehicle traveling at "a very high rate of speed" and his radar detection device indicated that defendant's vehicle was traveling at the rate of "86 miles per hour" in what Chief Bentley described as being a 55 miles per hour speed zone. T. 6-7. This testimony has not been contradicted by the defendant and therefore it is reasonable for this Court to conclude that the defendant committed a speeding offense under New York State's Vehicle and Traffic Law.

Section 140.10 of the New York Criminal Procedure Law ("CPL") authorizes a police officer to arrest a person without a warrant for any offense when the

officer has reasonable cause to believe that such person has committed such offense in his presence.  Section 155 of the New York Vehicle and Traffic Law provides that for purposes of arrest without a warrant, a traffic infraction shall be deemed an offense.

The fact that the traffic offense in this case may have been minor in nature is also of no legal consequence for "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (police officer authorized to arrest driver where neither she nor her children were wearing seat belts); *see Arkansas v. Sullivan*, 532 U.S. 769, 771 (2001) (police officer authorized to arrest driver for speeding); *New York v. Class*, 475 U.S. 106, 118 (1986) (formal arrest permissible for a traffic offense under New York law); *United States v. Scopo*, 19 F.3d 777, 781-782 (2d Cir.) (probable cause to stop and arrest driver where police officers observed driver's failure to signal while changing lanes), *cert. denied,* 513 U.S. 877 (1994).

Chief Bentley, having personally observed defendant's speeding vehicle and the radar reading establishing the speed of the defendant's vehicle in a 55 miles per hour speed zone, certainly had probable cause to stop the defendant's vehicle and arrest the defendant as the driver of the vehicle.  Therefore, the defendant's argument on this issue is totally without legal merit.

### (2)    The Subsequent Custodial Detention Of The Defendant

The defendant argues that he "was subjected to an investigatory detention without reasonable suspicion that criminal activity was afoot" and that "the retention of identification documents by the police" constituted evidence establishing that he had been made subject to "police detention."  Dkt. #13, p. 8.

This argument of the defendant totally ignores the facts established by the uncontradicted testimony of Chief Bentley who I find to be credible.  As stated earlier, Chief Bentley personally observed defendant's speeding vehicle as it approached him and read the radar calculations indicating that defendant's vehicle was traveling 86 miles per hour in a 55 mile per hour speed zone.  This fact alone established legal probable cause for Chief Bentley to arrest the defendant under the Fourth Amendment, *Atwater, supra*, and under New York Law, *Class, supra, Scopo, supra*.

Instead of taking the defendant into custody and transporting him to the police station, Chief Bentley was willing to give the defendant the benefit of his explanation that he was rushing home in response to his mother's distress call and offered his assistance to the defendant in this regard.  T. 7-8.  However, the Chief chose "to verify" the defendant's story by accompanying him to his house, and in doing so, he retained the defendant's driver's license.  T. 36.  Such retention of the defendant's license under the actual facts and circumstances of January 5, 2011 is of no legal consequence as claimed by the defendant.  The action of Chief Bentley at this

point in time in no way constituted a violation of defendant's legal rights and, therefore, this argument of defendant is totally rejected.

### (3)     The Entry  Into The Defendant's Home

The defendant argues that the entry into his home was unlawful and in violation of the Fourth Amendment to the Constitution.  He further asserts that "one closely guarded exception to the warrant requirement is made for probable cause, combined with 'exigent' circumstances" and that this exception does not apply in this case "since there is no evidence in the record to support probable cause to believe a crime was being committed inside the house."  Dkt. #13, pp. 10-11.

Counsel for the defendant has misstated the law relative to the application of "exigent circumstances" in the context of the Fourth Amendment.  There does not have to be "probable cause to believe a crime was being committed inside the house" in order to have the doctrine of "exigent circumstances" apply.  As the United States Supreme Court stated in *Mincey v. Arizona*, 437 U.S. 385 (1978):

> The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.

Id. at 392.

This principle was reiterated by the court in *Bringham City Utah v. Stuart*, 547 U.S. 398 (2006) wherein the Court proclaimed:

One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.

*Id.* at 403; *see also United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008).

The Second Circuit Court of Appeals has instructed that "the test to determine whether exigent circumstances exist 'is an objective one that turns on . . . the totality of the circumstances confronting law enforcement agents in the particular case.' *MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (*en banc*). The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable officer to believe that there was an urgent need to render aid or take action." *Klump, supra* at 117-118.

Chief Bentley observed and clocked a speeding vehicle traveling at the rate of 86 miles per hour in a 55 miles per hour speed zone. When he confronted the driver of this vehicle, he observed an adult male who "was very visibly upset, agitated" and who "appeared" to have "been crying." T. 7-8. This same adult male, the defendant, told Chief Bentley that he "was going fast because [his] mother's fallen, she called [him] and said that she had fallen down" and that when the defendant "tried to call her back, she had not answered the phone." T. 7.

The fact that the defendant was driving his vehicle 86 miles per hour in a 55 miles per hour speed zone is indicative that the defendant considered this to be an "emergency situation" justifying his actions. Based on what he observed and heard from the defendant, it certainly was reasonable for Chief Bentley, a police officer with 38 years of experience (T. 4) to believe an "emergency situation" existed when he volunteered to assist the defendant and the defendant accepted his offer of assistance. T. 8. Chief Bentley told the defendant that he would follow him to the defendant's residence so that they could check on the defendant's mother whom the defendant described as being "very elderly." T. 8-9. "The emergency doctrine is derived from police officers' community caretaking function." *United States v. Bradley,* 312 F.3d 1212, 1214 (9th Cir. 2003).

Nothing had changed or intervened between the time Chief Bentley stopped the defendant and arrived at the doorstep of the defendant's residence with respect to the circumstances involving defendant's "very elderly" mother and, therefore, it was reasonable for Chief Bentley to believe that she may be inside in an injured condition and therefore immediate action was necessary. At no time did the defendant say or indicate that he did not want the Chief to accompanying him into the house. To the contrary, the defendant thanked the Chief for coming with him. T. 10, 14. The defendant and the Chief entered the premises together. Since Chief Bentley had entered the defendant's residence for purposes of assisting the defendant in response to the defendant's mother's health and safety circumstances, *i.e.*, exigent circumstances, his entry did not constitute a violation of the defendant's Fourth

Amendment rights. Sgt. Gustafson's near simultaneous entry into the premises was for the same reason and therefore also lawful.

When they were "three or four steps inside the house," Chief Bentley "smelled" marijuana. T. 22, 10-11. He asked the defendant "if he had been smoking marijuana" and the defendant replied, "no, not right then." T. 11. Chief Bentley also observed "blowers and fans going in the house" and inquired of the defendant "as to why the blowers were going." T. 11. At that point, the defendant "stepped to the basement doorway and started to move a blower out of the way" and when the Chief asked him "what's going on," the defendant replied, "well basically you know." T. 11. "At that point in time Sgt. Gustafson came in behind [the Chief]." T. 11, 23. The defendant started to walk down the basement stairs so the Chief followed him as did Sgt. Gustafson. Chief Bentley testified that it "appeared to [him] there was something going on" and that he "was trying to keep an eye on [the defendant's] mother and [the defendant] at the same time." T. 11. He further elaborated that in the course of his police duties, "if [he is] dealing with someone, [he] want[s] to keep them within [his] line of sight." T. 40.

Having "smelled a very strong" odor of "marijuana," and having observed and heard the blowers and fans, it was certainly reasonable for Chief Bentley to believe that possible criminal activity was occurring within the residence of the defendant. As a result, these facts created an entirely reasonable inference that allowing the defendant

to proceed alone into the basement might prove dangerous to the safety of Chief

Bentley and Sgt. Gustafson.  As the Court of Appeals for the Second Circuit has stated:

> At the core of Terry, Long and Buie is the common understanding that the Fourth Amendment's reasonableness requirement is sufficiently flexible to allow officers who have an objectively credible fear of danger to take basic precautions to protect themselves. Buie recognized that when officers are inside a home-ordinarily an enclosed, unfamiliar space-they are particularly vulnerable to surprise attacks. Id. at 333, 110 S.Ct. 1093. The Court's paramount concern in Buie was not why the officers were present in the home, but rather, why the officers might fear for their safety and what they could do to protect themselves. Buie 's logic therefore applies with equal force when officers are lawfully present in a home for purposes other than the in-home execution of an arrest warrant, at least where their presence may expose the officers to danger that is similar to, or greater than, that which they would face if they were carrying out an arrest warrant. See id. Indeed, officers executing an arrest warrant may at times enjoy the tactical benefits of counteracting a potential threat by engaging in careful planning and entering with significant force. By contrast, in other circumstances where they are present lawfully-such as, for example, responding to an emergency call or serving an order of protection-officers may be compelled to enter dangerous environments without an adequate opportunity to take effective prophylactic measures.

United States v. Miller, 430 F.3d  93, 98-99 (2d Cir. 2005); *cert denied*, 547 U.S. 1206

(2006).

When they reached near "the landing," it became "very obvious" to Chief

Bentley and Sgt. Gustafson that "there was marijuana growing in the house."  T. 11-12,

44.  Upon seeing the marijuana plants, Chief Bentley yelled "stop" and Chief Bentley

directed Sgt. Gustafson to arrest the defendant and remove him from the premises.

The "protective sweep" by Chief Bentley and Sgt. Gustafson was limited in that it merely amounted to following the defendant down the basement stairs and watching him briefly.  "This quick and unobtrusive search was narrowly tailored to dispel the threat that [the defendant] would have posed by being in the [basement] alone."  Consequently, I conclude that Chief Bentley and Sgt. Gustafson did not violate the defendant's Fourth Amendment rights by entering the basement area.  *United States v. Miller, supra* at 101-102.  It was during this limited, lawful activity that Chief Bentley and Sgt. Gustafson observed a marijuana growing operation in "plain view" in the basement.

### 4.    The Subsequent Search Of The Defendant's Basement

### A.    Application Of The Plain View Exception

> It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.

*Harris v. United States*, 390 U.S. 234, 236 (1968); Horton v. California, 496 U.S. 128, 135 (1990).

The plain view exception to the Fourth Amendment warrant requirement "authorizes seizure of illegal or evidentiary items visible to a police officer whose access has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity."  *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).   In accordance with this exception, the warrantless seizure of an item is

justified where: (1) the police have lawful access to the place from which the item can be plainly viewed; (2) the item seized is in fact in plain view at the time it is discovered; and (3) it is immediately apparent to the police at the time of discovery that the item constitutes evidence of, an instrumentality of, or fruit of, a crime. *Horton v. California*, 496 U.S. 128, 136 (1990); *United States v. $557,933.89*; *More or Less, In U.S. Funds,* 287 F.3d 66, 81-82 (2d Cir. 2002); *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir.); *cert. denied*, 513 U.S. 877 (1994); *United States v. Kiyuyung*, 171 F.3d 78 (2d Cir.1999). To *meet* the "immediately apparent" standard, police officers must have probable cause to believe that an object in plain view is contraband without conducting some further search of the object. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

Since Chief Bentley and Sgt. Gustafson were lawfully on the premises and were lawfully conducting a "protective sweep" when they observed the marijuana plants and the growing paraphernalia in "plain view," they immediately had probable cause to believe that what they observed constituted contraband and/or evidence of an instrumentality of, or fruit of, a crime which they could have then seized at that time. However, Chief Bentley decided not to do so after directing that the defendant be placed under arrest. Instead, he chose a more conservative route when he decided to have the premises secured by other police officers (T. 13) since he concluded that "there was plenty of time to get a search warrant." T. 14.

## B.     The Statements Of The Defendant

Immediately after the defendant was arrested and escorted from his home, Sgt. Gustafson gave *Miranda* warnings and advice of rights to the defendant which he acknowledged he understood.  T. 45-47, 49; Government Exhibit 1.  After having been warned and advised of his rights in accordance with the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966), the defendant voluntarily gave a statement which was reduced to writing and signed by the defendant wherein he admitted that "for the past 4 years [he has] been growing marijuana at [his] residence" and that he "had developed a growing operation, mainly in the basement of [his] house" and that "right now at [his] house [he has] approximately 200 marijuana plants growing in different stages" along with "growing lights, bottles of $CO_2$, fans, blowers and electric running the rooms," consisting of "5 growing rooms, plus the garages."  T. 49-51; Government Exhibit 3.

Based on the uncontradicted testimony of Sgt. Gustafson, I find that the defendant knowingly and voluntarily waived his constitutional rights under the Fifth Amendment and that his statement, Government Exhibit 3, was voluntarily and freely given to Sgt. Gustafson.

## C.     The Validity Of The Search Warrant

It logically and legally follows that if the police could have seized the marijuana plants and growing paraphernalia from the defendant's residence without a

search warrant, based on the "plain view" principle, as set forth above, they could legally use the information personally observed and learned while legally on the premises, as the basis for establishing probable cause for the issuance of a search warrant authorizing the search of defendant's residence and outbuildings based on that same principle.

After obtaining the signed statement of the defendant, Government Exhibit 3, Chief Bentley submitted his sworn "Search Warrant Application," Government Exhibit 4, to Town Justice Hajdu for purposes of obtaining a search warrant authorizing a search of the defendant's residence and outbuildings and vehicles located on the premises.  T. 29.   Chief Bentley stated in the Application that the facts establishing probable cause for the issuance of a search warrant were based on his "personal knowledge" and the signed written statement of the defendant, Government Exhibit 3. Chief Bentley's personal observation of the marijuana plants and growing paraphernalia coupled with the defendant's admission that "right now at [his] house [he has] approximately 200 marijuana plants growing in different stages," certainly established probable cause for the issuance of the search warrant authorizing the search of defendant's residence and outbuildings and vehicles and the seizure of the marijuana plants and marijuana growing equipment.  Government Exhibit 5.

The search and seizure of evidence took place at defendant's residence on January 5, 2011 pursuant to said search warrant.

## D.    Defendant's Consent To Search

As previously stated, after Sgt. Gustafson placed the defendant under arrest, he advised him of his rights in accordance with the *Miranda* Rules which the defendant acknowledged he understood.  T. 45-47, 49; Government Exhibit 1.  It was after being so advised and warned that the defendant agreed to consent to a search of his residence and property owned by him without a search warrant.  T. 47-48.  After the defendant had been transported to the police station, Sgt. Gustafson prepared a written "Permission to Search" form, Government Exhibit 2, and had the defendant read it before he signed it.  The defendant then signed the "Permission to Search" form, Government Exhibit 2.  T. 48-49, 64, 67.

Because the defendant had been advised of his rights and given *Miranda* warnings prior to being asked to consent to a search of his property, and because the written "Permission to Search" form reiterated the defendant's constitutional rights "not to have a search made of the premises and property owned by [him] . . . without a search warrant," which the defendant read before he signed the form, I find that the defendant made a knowing and voluntary waiver of his rights and knowingly and voluntarily consented to a search of his property and a seizure of evidence from that property without a search warrant.

## CONCLUSION

It is the finding of this Court that the evidence seized from the defendant's residence and outbuildings was properly seized pursuant to a validly issued search warrant. Government Exhibit 5. Nevertheless, it is also the finding of this Court that such evidence could also have been lawfully seized from the premises of the defendant pursuant to the "Permission to Search" which he knowingly and voluntarily executed, Government Exhibit 2, or in the alternative, in accordance with the "plain view" doctrine.

Since the defendant had been advised properly of his constitutional rights and properly warned in accordance with *Miranda* prior to making and/or giving any statements to Sgt. Gustafson, and acknowledged that he understood his rights, I find that the defendant knowingly and voluntarily waived his rights under the Fifth Amendment to the Constitution and voluntarily and freely gave his statements to the police. Government Exhibit 3.

Therefore, it is recommended that defendant's motion to suppress the use of his statements at trial be DENIED in all respects, and it is recommended that defendant's motion to suppress the use of the evidence seized from his property at trial be DENIED in all respects.

It is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to**

**comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**


DATED:      Buffalo, New York
            June 14, 2013


                                        *S/ H. Kenneth Schroeder, Jr.*
                                        **H. KENNETH SCHROEDER, JR.**
                                        **United States Magistrate Judge**